UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
JACKSONVILLE DIVISION

LORRIE GAIL GRUBER,

       Plaintiff,

v.                               Case No.  3:16-cv-1193-J-MCR

ACTING COMMISSIONER OF THE
SOCIAL SECURITY ADMINISTRATION,

       Defendant.
_____/

## <u>MEMORANDUM OPINION AND ORDER</u>[1]

**THIS CAUSE** is before the Court on Plaintiff's appeal of an administrative

decision denying her application for a Period of Disability and Disability Insurance

Benefits ("DIB").  Plaintiff alleges she became disabled on October 29, 2008.  (Tr.

387.)  A hearing was held before the assigned Administrative Law Judge ("ALJ")

on November 13, 2012, at which Plaintiff was represented by a non-attorney

representative.  (Tr. 96-123.)  The ALJ found Plaintiff not disabled from October

29, 2008 through January 11, 2013, the date of the decision.  (Tr. 176-89.)  On

September 13, 2014, the Appeals Council vacated the ALJ's January 11, 2013

decision and remanded the case to the ALJ for further proceedings.[2]  (Tr. 197-

98.)  In accordance with the remand order, the ALJ held additional hearings on

---

[1] The parties consented to the exercise of jurisdiction by a United States
Magistrate Judge.  (Doc. 20.)

[2] On remand, the ALJ was directed to evaluate, *inter alia*, the opinion of Plaintiff's
treating physician, Orlando Florete, M.D.  (Tr. 197-98.)

April 14, 2015 and November 17, 2015.  (Tr. 124-45, 60-95.)  On December 16,

2015, the ALJ issued a second decision finding Plaintiff not disabled from

October 29, 2008 through December 31, 2013, the date last insured.[3]  (Tr. 30-

51.)

Plaintiff is appealing the Commissioner's decision that she was not

disabled from October 29, 2008 through December 31, 2013.  Plaintiff has

exhausted her available administrative remedies and the case is properly before

the Court.  The undersigned has reviewed the record, the briefs, and the

applicable law.  For the reasons stated herein, the Commissioner's decision is

**REVERSED and REMANDED.**

### I.      Standard of Review

The scope of this Court's review is limited to determining whether the

Commissioner applied the correct legal standards, *McRoberts v. Bowen*, 841

F.2d 1077, 1080 (11th Cir. 1988), and whether the Commissioner's findings are

supported by substantial evidence, *Richardson v. Perales*, 402 U.S. 389, 390

(1971).  "Substantial evidence is more than a scintilla and is such relevant

evidence as a reasonable person would accept as adequate to support a

conclusion."  *Crawford v. Comm'r of Soc. Sec.*, 363 F.3d 1155, 1158 (11th Cir.

2004).  Where the Commissioner's decision is supported by substantial evidence,

---

[3] Plaintiff had to establish disability on or before December 31, 2013, her date last insured, in order to be entitled to a period of disability and DIB.  (Tr. 31.)

the district court will affirm, even if the reviewer would have reached a contrary result as finder of fact, and even if the reviewer finds that the evidence preponderates against the Commissioner's decision. *Edwards v. Sullivan*, 937 F.2d 580, 584 n.3 (11th Cir. 1991); *Barnes v. Sullivan*, 932 F.2d 1356, 1358 (11th Cir. 1991). The district court must view the evidence as a whole, taking into account evidence favorable as well as unfavorable to the decision. *Foote v. Chater*, 67 F.3d 1553, 1560 (11th Cir. 1995); *accord Lowery v. Sullivan*, 979 F.2d 835, 837 (11th Cir. 1992) (stating the court must scrutinize the entire record to determine the reasonableness of the Commissioner's factual findings).

## II.    Discussion

Plaintiff raises three issues on appeal. First, Plaintiff argues that the ALJ failed to reconcile the opinions of the non-examining medical expert and orthopedic surgeon, Dr. Kwock, who testified at the most recent hearing before the ALJ, regarding the severity of Plaintiff's cervical and lumbar spine conditions with the opinions of the treating neurosurgeon, Dr. Spatola, and the treating orthopedic surgeon, Dr. Ero, and also with Dr. Ero's lumbar spine surgical report from November 21, 2013. Second, Plaintiff argues that the ALJ erred in failing to articulate good cause for not crediting the opinions of Plaintiff's long-time treating pain physician, Dr. Florete. Finally, Plaintiff argues that the ALJ failed to properly analyze Plaintiff's pain and credibility. Defendant responds that the ALJ properly evaluated the medical opinions of record and Plaintiff's subjective complaints,

and her RFC assessment is supported by substantial evidence.

### A. Standard for Evaluating Opinion Evidence and Subjective Complaints

The ALJ is required to consider all the evidence in the record when making a disability determination. *See* 20 C.F.R. § 404.1520(a)(3). With regard to medical opinion evidence, "the ALJ must state with particularity the weight given to different medical opinions and the reasons therefor." *Winschel v. Comm'r of Soc. Sec.*, 631 F.3d 1176, 1179 (11th Cir. 2011). Substantial weight must be given to a treating physician's opinion unless there is good cause to do otherwise. *See Lewis v. Callahan*, 125 F.3d 1436, 1440 (11th Cir. 1997).

"'[G]ood cause' exists when the: (1) treating physician's opinion was not bolstered by the evidence; (2) evidence supported a contrary finding; or (3) treating physician's opinion was conclusory or inconsistent with the doctor's own medical records." *Phillips v. Barnhart*, 357 F.3d 1232, 1240-41 (11th Cir. 2004). When a treating physician's opinion does not warrant controlling weight, the ALJ must nevertheless weigh the medical opinion based on: (1) the length of the treatment relationship and the frequency of examination, (2) the nature and extent of the treatment relationship, (3) the medical evidence supporting the opinion, (4) consistency of the medical opinion with the record as a whole, (5) specialization in the medical issues at issue, and (6) any other factors that tend to support or contradict the opinion. 20 C.F.R. § 404.1527(c)(2)-(6).

Although a treating physician's opinion is generally entitled to more weight than a consulting physician's opinion, see *Wilson v. Heckler*, 734 F.2d 513, 518 (11th Cir. 1984) (per curiam); 20 C.F.R. § 404.1527(c)(2), "[t]he opinions of state agency physicians" can outweigh the contrary opinion of a treating physician if "that opinion has been properly discounted," *Cooper v. Astrue*, 2008 WL 649244, *3 (M.D. Fla. Mar. 10, 2008). Further, "the ALJ may reject any medical opinion if the evidence supports a contrary finding." *Wainwright v. Comm'r of Soc. Sec. Admin.*, 2007 WL 708971, *2 (11th Cir. Mar. 9, 2007) (per curiam). *See also Sryock v. Heckler*, 764 F.2d 834, 835 (11th Cir. 1985) (per curiam) (same).

"The ALJ is required to consider the opinions of non-examining state agency medical and psychological consultants because they 'are highly qualified physicians and psychologists, who are also experts in Social Security disability evaluation.'" *Milner v. Barnhart*, 275 F. App'x 947, 948 (11th Cir. May 2, 2008) (per curiam). *See also* SSR 96-6p (stating that the ALJ must treat the findings of State agency medical consultants as expert opinion evidence of non-examining sources). While the ALJ is not bound by the findings of non-examining physicians, the ALJ may not ignore these opinions and must explain the weight given to them in his decision. SSR 96-6p.

When a claimant seeks to establish disability through her own testimony of pain or other subjective symptoms, the Eleventh Circuit's three-part "pain standard" applies. *Holt v. Sullivan*, 921 F.2d 1221, 1223 (11th Cir. 1991) (per

curiam). "If the ALJ decides not to credit such testimony, he must articulate explicit and adequate reasons for doing so." *Id*.

> The pain standard requires (1) evidence of an underlying medical condition and either (2) objective medical evidence that confirms the severity of the alleged pain arising from that condition or (3) that the objectively determined medical condition is of such a severity that it can be reasonably expected to give rise to the alleged pain.

*Id.*

Once a claimant establishes that her "pain is disabling through objective medical evidence that an underlying medical condition exists that could reasonably be expected to produce the pain," pursuant to 20 C.F.R. § 404.1529, "all evidence about the intensity, persistence, and functionally limiting effects of pain or other symptoms must be considered in addition to the medical signs and laboratory findings in deciding the issue of disability." *Foote*, 67 F.3d at 1561; *see also* SSR 96-7p (stating that after the ALJ finds a medically determinable impairment exists, the ALJ must analyze "the intensity, persistence, and limiting effects of the individual's symptoms to determine the extent to which the symptoms limit the individual's ability to do basic work activities").

When a claimant's "statements about the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence," the ALJ "must make a finding on the credibility of the individual's statements based on a consideration of the entire case record." SSR

96-7p.

> When evaluating the credibility of an individual's statements, the adjudicator must consider the entire case record and give specific reasons for the weight given to the individual's statements. . . . The reasons for the credibility finding must be grounded in the evidence and articulated in the determination or decision. It is not sufficient to make a conclusory statement that "the individual's allegations have been considered" or that "the allegations are (or are not) credible." It is also not enough for the adjudicator simply to recite the factors that are described in the regulations for evaluating symptoms.[4] The determination or decision must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight.

*Id.*

"[C]redibility determinations are the province of the ALJ," *Moore v. Barnhart*, 405 F.3d 1208, 1212 (11th Cir. 2005), and "[a] clearly articulated credibility finding with substantial supporting evidence in the record will not be disturbed by a reviewing court," *Foote*, 67 F.3d at 1562.

## B. The ALJ's December 16, 2015 Decision

The ALJ found that Plaintiff had severe impairments, including "history of spinal fusion [at] C4-7, lumbar degenerative disc disease, osteoarthritis,

---

[4] These factors include: (1) a claimant's daily activities; (2) the location, duration, frequency, and intensity of the claimant's pain or other symptoms; (3) any precipitating and aggravating factors; (4) the type, dosage, effectiveness, and side effects of any medication taken to alleviate the claimant's pain or other symptoms; (5) any treatment, other than medication, received by the claimant to relieve the pain or other symptoms; (6) any measures used to relieve the pain or other symptoms; and (7) other factors concerning the claimant's functional limitations and restrictions due to pain or other symptoms. 20 C.F.R. § 404.1529(c)(3); SSR 96-7p.

hypertension, and obesity." (Tr. 33.) The ALJ also found that through the date

last insured, Plaintiff had the residual functional capacity ("RFC") to perform light

work with the following additional restrictions:

> [T]he claimant has the ability to lift and/or carry ten pounds
> frequently, and twenty pounds occasionally. She can sit for a total of
> seven hours during an eight-hour day. The claimant can stand [a]
> total of six hours, and walk a total of four hours, during an eight-hour
> day. The claimant can continuously use her upper extremities in
> reaching from her waist to chest. She can frequently reach above
> her shoulders, and continuously handle, finger, and feel. She can
> occasionally climb stairs and ramps, but never climb ladders, ropes
> or scaffolds. She can never crawl, but can occasionally balance,
> stoop, kneel, and crouch. The claimant can tolerate occasional
> exposure to workplace hazards[,] such as moving machinery and
> unprotected heights.

(Tr. 35.)

In arriving at the RFC, the ALJ gave great weight to the non-examining

opinions of Dr. Kwock because they were "consistent with the claimant's

treatment history and the overall medical evidence of record." (Tr. 38.) The ALJ

addressed Dr. Kwock's opinions as follows:

> John Kwock, M.D., an independent medical expert testified at the
> hearing. Dr. Kwock stated that he was an orthopedic surgeon. He
> provided a medical opinion within the fields of orthopedics and
> orthopedic surgery, and to a reasonable degree of certainty, that the
> claimant's medically determinable impairments do not meet, nor in
> combination equal, a Listing. . . . He opined MRIs and CT scans of
> lumbar spine, and an EMG, did not objectively substantiate any
> neurological involvement. He noted the claimant's impairments
> included degenerative joint and degenerative disk disease, with a
> moderate-to-severe degree of changes, particularly in L4/5. Dr.
> Kwock found the studies were not indicative of nerve root or cord
> involvement. The EMG of the lower extremities in February of 2012,

found at Exhibit 15F, showed right, subacute L4/5 radiculopathy. Dr. Kwock stated the previous EMG study was suggestive of residual findings of root compression, but evidence did not show this condition still existed. Dr. Kwock noted EMG studies were in the lowest tier of reliability, in terms of diagnostic usefulness.

Dr. Kwock opined the claimant's lumbar spine impairment did not meet a Social Security Listing. He observed that [the] exam of the upper and lower extremities, cervical spine, and lumbar spine [at] Exhibit 26F, did not note radicular distribution of pain, no loss of motion, or motor weakness. He stated lower extremity exam showed no distribution consistent with lower nerve root problems, some loss of motion, and abnormal range of motion of lumbar spine. However, there was no motor weakness, no sensory loss, and reflexes were symmetrical. Straight leg raise tests were negative. Diagnosis was given of lumbar degenerative disk disease and arthritic changes. He testified that in November of 2013, the claimant underwent a hemi-laminectomy from L1-L5. However, there were no subsequent records to document course of treatment after the operation.

Dr. Kwock stated records regarding the claimant's cervical condition were almost remote. He stated records contained only one test, a cervical spine MRI in May of 2007. He opined this was mild reading of MRI of cervical spine. He observed the study revealed osteoarthritis [sic] changes to the discs, and posterior bulge at T2/3. He stated the imaging was suggesting [sic] of mild disk bulge and mild arthritic changes, but showed no nerve root or cord involvement.

Regarding specific functional limitations, Dr. Kwock opined the claimant was capable of performing light [work], in that the claimant had the ability to lift and/or carry ten pounds frequently, and twenty pounds occasionally. He opined the claimant could sit for a total of seven hours, stand [a] total of six hours, and walk a total of four hours, during an eight-hour day. The claimant could continuously use her upper extremities in reaching from her waist to chest. She could frequently reach above her shoulders, and continuously handle, finger, and feel. The claimant could occasionally climb stairs and ramps, but never climb ladders, ropes or scaffolds. She could never crawl, but could occasionally balance, stoop, kneel, and crouch. Dr. Kwock recommended that the claimant tolerate occasional exposure to workplace hazards such as moving

machinery and unprotected heights.

When asked about Dr. Florete's opinions contained in Exhibit 16F, Dr. Kwock stated he disagreed with limiting the claimant to a sedentary status, and said it was his opinion that the claimant was capable of a higher level of physical exertion, based on his reading of the medical record. Dr. Kwock noted that Exhibit 16F contained a physical exam from July, in which the claimant's use of the upper extremities was an area of concern. However, on cervical spine exam, active spine range of motion was within normal limits. He noted Dr. Florete placed considerable limitations on the claimant's lumbar spine, but lumbar exam showed active range of motion to be within normal limits. The claimant's station was mid-position, and her gait was recorded as normal. The examination did not contain many positive findings that would explain trouble in the lumbar area. Dr. Kwock opined there were no findings to support a limitation to sedentary work.

Dr. Kwock was asked to explain the difference in evaluation found in Exhibits 9F and 16F. He noted that Dr. Florete did not record a sensory test, and that neurosurgical examination in Exhibit 9F noted that sensory was decreased in left C5/6 distribution and decreased in left L5-S1 distribution. Deep tendon reflexes were symmetrical throughout. Motor strength was 4+ to 5 out of 5 throughout, but this finding was not consistent with a nerve root description of motor weakness. Dr. Kwock explained that if there was nerve root involvement of L5 root, it would produce certain areas of weakness in lower extremities, and not necessary [sic] affect other areas. However, whole left leg weakness was not consistent with a nerve root motor finding. He stated exam must document specific findings to indicated [sic] nerve root involvement. Dr. Kwock addressed the X-Ray and CT scan findings contained in Exhibit 26F. He noted these findings showed osteophytes in the lumbar spine and retrolisthesis. He testified that osteophyte [sic] was a bone spur, which was an outgrowth of bone around a joint, and was a response to increased stress on the joint from the arthritis. He noted this could be a source of pain and impairment. . . . Dr. Kwock explained retrolisthesis was the movement of one bone relative to the other. If MRI or X-Ray showed retrolisthesis occurring, it meant one spinal element was sinking, relative to the one located below. Regarding stenosis, Dr. Kwock testified the claimant did have neural foraminal

stenosis at the L2/3 level, as shown by a lumbar spine CT scan in Exhibit 22F, but this imaging showed only mild narrowing of the left neuroforaminal.

(Tr. 36-38.)

In addition, the ALJ addressed numerous medical records, including the

records from Plaintiff's November 21, 2013 lumbar surgery as follows:

Diagnostic impression noted multi-level degenerative disease of the lumbar spine, most notable at L1 and L5, with bilateral foraminal stenosis, left worse than right, and associated severe left lower extremity radiculopathy. Due to the claimant's symptoms of radiculopathy and findings of stenosis at multiple levels, the claimant underwent lumbar L1-L5 left hemilaminotomy, partial facetectomy and foraminotomy, with discectomy at L3-L4 and L4-L5. Follow-up with Dr. Ero was scheduled for December 19, 2013. Dr. Ero's records dated January 22, 2014, documented that the claimant failed to show for a follow-up appointment. (21F, 22F).

(Tr. 42.)

Further, the ALJ discussed the medical opinions of other non-examining

medical experts, consultative examiners, and treating physicians. For example,

the ALJ discussed the physical capacities evaluation form completed by Dr.

Orlando Florete on August 17, 2012, but found Dr. Florete's limitations "to be

excessive and not supported by the objective medical evidence of record." (Tr.

44-45.) The ALJ stated:

Dr. Florete does have a treating relationship with the claimant; however, his treatment records do not support his recommended limitations. Dr. Florete's physican examination from March 2, 2012, showed normal gait and station. Cervical spine range of motion was normal, as was thoracic and lumbar spine range of motion. There was moderate cervical and lumbar tenderness. Sensation, deep

tendon reflexes, and motor exam were all within normal limits. Dr. Florete did not document any findings that would corroborate his recommended level of exertion. (16F). The doctor's opinions are without substantial support from the other evidence of record, and the opinions of Dr. Kwock are more consistent with the overall medical evidence of record. Based on these factors, the opinions of Dr. Florete are given only little weight.

(Tr. 45.)

The ALJ also discussed in some detail the opinions of the consultative examiner, Dr. Robert Shefsky, who completed a medical source statement on April 29, 2015. (Tr. 45-46.) The ALJ stated: "I give some weight to the findings and opinions of Dr. Shefsky, as they are generally consistent with the consultative examination, and the objective findings and course of the claimant's treatment history. However, I find that Dr. Kwock's medical opinions are more consistent with the overall medical evidence of record[.]" (Tr. 46.)

In assessing Plaintiff's credibility, the ALJ stated:

The claimant alleges disabling impairments, but a review of the longitudinal the [sic] medical evidence of record does not document complications due to the impairments that would be disabling under governmental guidelines. The claimant alleges significant restrictions in her ability to perform activities of daily living, but the severity of impairment alleged by the claimant is not supported by objective medical evidence. The objective medical evidence does document a history of spinal fusion C4-7, lumbar degenerative disc disease, osteoarthritis, hypertension, and obesity. However, consultative examination in September of 2011 showed no arm atrophy, and grip strength of four out of five bilaterally. The claimant had good range of motion of her hands. She did not require the use of assistance [sic] device to ambulate, but she indicated she kept a cane with her only for balance and security due to falls. (8F).

12

Although the claimant alleged an onset date of October 29, 2008, there are few treatment records until March 2010. X-ray of the thoracic spine from May of 2010 noted the facet joints appeared grossly unremarkable. (5F). Records from the Institute of Pain Management showed the claimant's station to be mid-position and without abnormalities. Her gait was normal. (5F). At the consultative examination in September of 2011, the claimant had no abnormalities of the upper extremities. Arm strength was four and one-half out of five bilaterally. The claimant had good range of motion of the shoulders and hands. She had no impairment of fine or gross dexterities bilaterally. The claimant's lower extremities revealed mild swelling in her right lower extremity. There were no observed abnormalities in the lower extremities. She had good range of motion of the hips, knees, ankles, and feet. There was no atrophy of the legs, and leg strength was four out of five bilaterally. (8F).

Treatment records at the Institute for Pain Management noted the claimant reported her medications were effective in reducing her pain levels. The claimant denied significant side effects. (5F) On examination in December of 2011, straight leg raise tests were negative. The lumbar muscles were normal in strength and tone. The lumbar spine alignment displayed normal alignment. Sensation was within normal limits (12F). Exam from September of 2012, documented mid-position station, without abnormalities. Gait was normal. No abnormalities were noted upon inspection of the head and neck, palpation of the joints, and muscles. Range of motion was normal. There was no evidence of subluxation, laxity, weakness, or atrophy. There was mild lumbar tenderness noted at midline L3, midline L5, midline S1. (19F).

In addition to limited objective medical evidence and conservative treatments, the claimant has several activities which are inconsistent with the total inability to work. The claimant is able to live independently at home. The claimant is able to perform some household chores, [sic] occasionally go with her husband to the grocery store.

In summation, the medical records do not support a worsening of the claimant's conditions or any long standing restrictions in her ability to function, other than those noted in the [RFC]. This finding is

supported by the objective testimony from Dr. Kwock, an independent medical expert.

(Tr. 47-48.)

Ultimately, the ALJ found Plaintiff capable of performing her past relevant work as a medical records clerk, as generally performed. (Tr. 48-49.) Alternatively, the ALJ found that Plaintiff was able to perform other jobs existing in significant numbers in the national economy, such as assembler and ticket seller. (Tr. 49-50.)

### C.    Analysis

The Court agrees with Plaintiff that the ALJ erred in her evaluation of the medical opinion evidence and Plaintiff's subjective complaints in determining the RFC. As an initial matter, in discrediting Plaintiff's subjective complaints, the ALJ noted that there was "limited objective medical evidence," that Plaintiff had undergone "conservative treatments," and that Plaintiff was engaged in activities that were inconsistent with a total inability to work. (Tr. 48.) These statements are not supported by the record.

First, contrary to the ALJ's statement, there is an abundance of objective medical evidence in this case documenting Plaintiff's impairments.[5] Plaintiff has been diagnosed with, *inter alia*, thoracic degenerative disc disease, thoracic

_____

[5] In discrediting Plaintiff's subjective complaints, the ALJ discussed evidence predating the lumbar surgery, mostly focusing on records showing no or mild abnormalities. (Tr. 47-48.)

14

spondylosis with myelopathy, cervical/thoracic/lumbar degenerative joint disease, neck pain, back pain/lumbago, chronic pain, limb pain, and muscle spasm. (*See* Tr. 614, 618, 622.) On examination, a number of positive findings related to these impairments have been reported and/or observed. (*See* Tr. 613, 617, 621, 625, 628, 631, 634, 637, 640, 649, 653, 658, 661, 809, 813, 816, 821, 825, 829, 871, 877, & 883 (noting transient weakness, numbness, and tingling sensation in the lower extremities, and numbness and tingling sensation in the upper extremities); Tr. 614, 622, 626, 629, 632, 638, 640-41, 644, 814, & 817 ("Thoracic Spine [Active Range of Motion] - Flexion is decreased and with pain. Extension is decreased and with pain. Paravertebral tenderness noted at the right and left paravetebral [sic] border. . . . Paravertebral tenderness noted at [the lumbar spine]."); Tr. 792 ("Moderately decreased [range of motion] of the thoracolumbar spine with reported aggravation of pain in the upper back with forward flexion and reported aggravation of pain in the lower back with extension. . . . Straight leg raising in the supine position was 45 degrees bilaterally with reported pain in [the] lower back and posterior legs. Straight leg raising in the sitting position was 75 degrees bilaterally with reported pain in [the] lower back and posterior legs."); Tr. 631-32, 634-35, 650, 654, 656, & 658-59 ("Cervical Spine [Active Range of Motion] - Rotation to the left is decreased and with pain. Rotation to the right is decreased and with pain. Cervical Spine Palpation - Moderate cervical tenderness noted at all levels. Paravertebral tenderness noted at the right and

left paravetebral [sic] border."); Tr. 798-99 ("She had increased pain with range of motion of her lumbar spine.  She had decreased range of motion in all fields of her cervical spine. . . . Sensory was decreased in the left C5-6 distribution from approximately the bib area through the thoracic spine down into the upper abdomen and decreased in the left L5-S1 distribution."); Tr. 830 (noting, *inter alia*, cervical flexion and extension were decreased and with pain; lumbar flexion was decreased and with pain; and tenderness was present due to spasm); Tr. 868 (noting moderate lumbar tenderness and spasticity); Tr. 820 ("The low back pain is more paravertebral in loacation [sic], worse on back extension than flexion and aggravated by lateral rotation."); Tr. 822, 872, & 884 (noting, *inter alia*, moderate cervical tenderness and spasticity, and moderate lumbar tenderness and spasticity); Tr. 924-25 ("Moderate paraspinal spasms. . . . Straight leg raising test is positive on the left.  Moderate weakness with difficulty especially on the left with toe walking and heel walking."); Tr. 953-54 ("There is moderate lumbosacral tenderness and significant guarding with lumbar range of motion. . . . Due to the severe stenosis at L1-L2 and L4-L5, the patient would benefit from an MRI evaluation of the lumbar spine which will be ordered.").)

The results of several diagnostic tests have also been abnormal.  (*See, e.g.*, Tr. 581 (noting the presence of osteophytes in the thoracic spine); Tr. 583 & 685 ("There are lateral bridging osteophytes in the midthoracic spine."); Tr. 800 (noting, *inter alia*, bulky osteophytosis laterally at the right mid thoracic spine and

16

at the thoracolumbar junction); Tr. 820 ("Her lumbar CT scan showed multilevel degenerative disc disease with lumbosacral retrolisthesis, the presence of disc osteophjyte [sic] complex at L1-L2, L4-L5 and L5-S1 and neural foraminal narrowing."); Tr. 833 (noting that the January 10, 2012 CT scan of the lumbar spine showed: "Multilevel diffuse degenerative disc disease with lumbosacral junction facet osteoarthritis and grade anterolisthesis as a result. Dorsal disco osteophytic changes at multiple levels . . . are noted and are most significant [at] the L1-2, L4-5 and to a lesser degree [at] the L5-S1 levels with neuroforaminal narrowing a[t] multiple levels most severe at the L4-5 level right greater than left."); Tr. 935 ("The post myelogram CT scan is reviewed [on November 12, 2013] and it does show multilevel degenerative disease with posterior disc osteophyte complexes more severe at L1-L2 and L2-L3 and moderate at L3-L4 and L4-L5. In all the levels, there is evidence of left lateral recess stenosis."); Tr. 1012 (noting that the November 7, 2013 CT of the lumbar spine post myelogram showed multilevel degenerative disc space loss with posterior disc osteophyte complexes, multilevel bilateral partial neural foraminal stenosis, most advanced at the L4-5 level, and multilevel degenerative facet arthropathy); Tr. 876 & 887 ("Her EMG/NCV of the [lower extremity] showed subacute or chronic right L4-L5 radiculopathy and reinervation of a left L5 radiculopathy."); 924-25 ("The patient worked up with MRI and myelogram CT scan consistent with severe foraminal stenosis, multiple levels, worse on the left."); Tr. 947 ("The MRI of the lumbar

spine was reviewed from 9/17/13 and also compared with the CT scan from 1/10/12. The findings are that of multilevel degenerative disease from L1 to S1. At L1-L2 there is a disc osteophyte complex with significant bony spurs noted with some associated central stenosis. At L2-L3, there is a disc osteophyte complex also."); Tr. 949-50 (noting that lumbar MRI performed on September 17, 2013 showed, *inter alia*, multilevel disc desiccation and disc height loss, broad disc bulge at multiple levels, moderate to severe bilateral neural foraminal stenosis at L4-L5); Tr. 932 ("X-rays of the lumbar spine, four views, done [on November 20, 2013] are remarkable for evidence of degenerative disease, multilevel with spondylosis multiple levels."); Tr. 1061 (noting radiological signs of moderate degenerative osteoarthritis of the cervical spine and moderate to severe degenerative osteoarthritis of the lumbar spine).)

Also, contrary to the ALJ's statement, medications (and other treatment modalities) did not effectively reduce Plaintiff's pain.[6] (*See* Tr. 630 (noting Percocet was not helping and the pain was a 10 out of 10); Tr. 951 ("She has been in pain management for the past 5 years and states that it is not helping her at all at this point. She has had numerous injections in the past including facet injections and trigger points and nothing is helping her. She has also had physical therapy in the past which actually made her worse."); Tr. 616 ("[S]he

_____

[6] At the hearing, Plaintiff testified that her medications made her "very sleepy" and drowsy. (Tr. 88, 115.)

never got any relief from the thoracic facet joint injections . . . . She had [p]hysical therapy, used a TENS unit and tried NSAIDS (Ibuprofen, Naproxyn) and none of them provided long term relief."); Tr. 797 ("She has received several epidural steroid injections, trigger point and facet injections with no relief."); Tr. 614 (stating that Plaintiff's thoracic pain was getting worse and was not responding to injections); Tr. 624 (noting no reduction in pain); Tr. 472 ("My medications are not helping.").) Although there are references in the record that Plaintiff's pain medications, which included Percocet and Morphine, among others, have somewhat or moderately reduced her pain, the same records indicate that Plaintiff's pain level was still an 8 or a 9 on the 10 point VAS scale. (*See* Tr. 612, 616, 620, 828.)

Further, Plaintiff's course of treatment can hardly be described as conservative given her surgeries (C4-C5, C5-C6, C6-C7 anterior cervical discectomies and interbody arthrodesis with polyetheretherketone cage using an anterior plating performed on December 3, 2007 and L1-L5 left hemilaminotomy, partial facetectomy and foraminotomy with discectomy at L3-L4 and L4-L5 performed on November 21, 2013), nerve/facet blocks, and epidural steroid injections, which provided no relief.[7] (*See* Tr. 564, 568-69, 612, 619, 644, 662, 664, 835, 880-82, 924-29.) Of note, Plaintiff underwent lumbar surgery on

---

[7] The record indicates that Plaintiff received conservative treatment for her knee pain (Tr. 596), but not necessarily for her neck and back pain.

November 21, 2013 due to the worsening of her condition, which contradicts the ALJ's statement that "the medical records do not support a worsening of the claimant's conditions" (Tr. 48).  (*See, e.g.*, Tr. 790 ("The pain has continued to worsen and has progressed to affecting her entire back as well.  She will soon be having fusions in the thoracic spine level and lumbar spine level."); Tr. 820 ("The patient continues to be miserable.  Her low back pain has been worsening."); Tr. 824 (noting escalating low back pain and significant neck pain, both of which were aggravated by activities); Tr. 929 ("Patient failed nonoperative treatment including physical therapy, medications, and spinal injections. . . . The patient is for [sic] surgical decompression of the left-sided foraminal stenosis for relief of the left lower extremity radiculopathy."); Tr. 946 ("The patient [is] with persistent back pain and leg pain . . . at almost a 9/10 [as of September 25, 2013].").)

As of November 21, 2013, the diagnostic impression was: "Multilevel degenerative disease of the lumbar spine, most notable at L1 and L5 with bilateral foraminal stenosis, left worse than right with associated left lower extremity radiculopathy, severe."  (Tr. 925.)  Dr. Ero noted: "Due to patient's symptoms of radiculopathy with the findings of stenosis noted at multiple levels, the patient is scheduled for multilevel decompression with laminectomy and partial facetectomy and foraminotomy as well as osteophytectomy and possible discectomy at multiple levels, L1 through L5."  (*Id.*)

Although the ALJ noted that Plaintiff had undergone a spinal fusion at C4-7

back in 2007, the ALJ (as well as Dr. Kwock on whose opinions the ALJ relied) did not seem to consider Plaintiff's lumbar surgery, which took place only one month before her insured status expired. (*See* Tr. 42, 75-76.) Instead, the ALJ focused on the fact that Plaintiff did not follow up with Dr. Ero after the lumbar surgery (Tr. 42), without considering that she could not afford to do so because she lost her health insurance.[8] (*See* Tr. 135-37; *see also* Tr. 612 (stating Plaintiff cannot afford Opana); Tr. 633 ("[Patient] was to have thoracic facet block, however has to hold due to finances. . . . [Patient] states [L]yrica helps, however she relies on samples due to cost. [Patient] is also taking [C]ymbalta through samples in our office."); Tr. 870 ("She was not seen for two months as she did not have any insurance, but now she again has insurance. . . . She requested . . . samples of Cymbalta and Lyrica as it is too expensive for her.").)

In order to assess Plaintiff's back condition following her lumbar surgery, the ALJ referred Plaintiff for a free orthopedic examination by Dr. Robert Shefsky, a consultative examiner, which took place on April 29, 2015. (Tr. 1059.) In the decision, the ALJ summarized Dr. Shefsky's findings, but gave them only "some weight . . . as they are generally consistent with the consultative examination, and the objective findings and course of the claimant's treatment history." (Tr. 46.) However, without any explanation, the ALJ found Dr. Kwock's opinions were

---

[8] After the surgery, Plaintiff was discharged to a short-term rehabilitation facility for daily physical therapy mobilization. (Tr. 982.)

"more consistent with the overall medical evidence of record."  (*Id.*)

When the ALJ weighed Dr. Kwock's opinions, she decided to give them great weight as being "consistent with the claimant's treatment history and the overall medical evidence of record."  (Tr. 38.)  However, as stated earlier, Plaintiff's treatment history actually supports her allegations of disabling impairments.  As to the "overall medical evidence of record," the record, which is almost 1100 pages, certainly includes evidence supporting Plaintiff's claim for disability.  In light of the ALJ's somewhat vague and conclusory reasons for adopting the opinions of a medical expert who has never examined the Plaintiff over the opinions of several treating and examining sources, the Court cannot conclude that the ALJ's decision is supported by substantial evidence.[9]

In addition, contrary to the ALJ's statement that Plaintiff was able to live independently and perform some household chores (Tr. 48), Plaintiff's daily activities were quite limited and she relied on family members for help.  (*See* Tr. 109 (stating that Plaintiff's adult daughter does the cooking and the housework); Tr. 137 ("Because of my diabetic episodes that I have, I'm not allowed to be alone.  Because I actually just completely go out when these episodes hit. And [my daughter] takes care of me."); Tr. 472 (stating that Plaintiff's daughter prepares the meals because Plaintiff has pain in her back and numbness in her

---

[9] Interestingly, the ALJ found both Dr. Shefsky's opinions and Dr. Kwock's opinions to be consistent with Plaintiff's treatment history.

legs); Tr. 473 ("I sit on a shower chair when bathing because my legs become numb and my back pain increases when I stand."); Tr. 474 ("My husband and daughter now complete the shopping. I cannot walk around the store for long periods of time due to pain and muscle spasms in my back."); Tr. 790 ("She can do some house work including light cooking for brief periods of time or folding clothing while sitting, but otherwise her oldest daughter does all the house work. . . . She has a seat in the shower. She tends to wear slip on shoes and requires assistance with putting on socks.").)

The performance of limited daily activities is not necessarily inconsistent with allegations of disability. *See, e.g.*, *Flynn v. Heckler*, 768 F.2d 1273, 1275 (11th Cir. 1985) (per curiam) (reversing and remanding the case to the Commissioner for lack of substantial evidence to support the finding that the claimant had no severe impairment, even though the claimant testified that she performed housework for herself and her husband, accomplished other light duties in the home, and "was able to read, watch television, embroider, attend church, and drive an automobile short distances"); *White v. Barnhart*, 340 F. Supp. 2d 1283, 1286 (N.D. Ala. 2004) (holding that substantial evidence did not support the decision denying disability benefits, even though the claimant reported that she took care of her own personal hygiene, cooked, did housework with breaks, helped her daughter with homework, visited her mother, socialized with friends sometimes, and, on a good day, drove her husband to and from

work, but needed help with grocery shopping, and could sit, stand, or walk for short periods of time).

Based on the foregoing, the ALJ's evaluation of Plaintiff's subjective complaints, as well as the medical opinion evidence, is not supported by substantial evidence.[10] Therefore, this case will be reversed and remanded with instructions to the ALJ to reconsider Plaintiff's subjective complaints and the medical opinions of record.

Accordingly, it is **ORDERED**:

1. The Commissioner's decision is **REVERSED** pursuant to sentence four of 42 U.S.C. § 405(g) and **REMANDED** with instructions to the ALJ to: (a) reconsider Plaintiff's subjective complaints and the medical opinions of record; (b) reconsider the RFC assessment, if necessary; and (c) conduct any further proceedings deemed appropriate.

2. The Clerk of Court is directed to enter judgment consistent with this Order and close the file.

3. In the event that benefits are awarded on remand, any § 406(b) or § 1383(d)(2) fee application shall be filed within the parameters set forth by the Order entered in *In re: Procedures for Applying for Attorney's Fees Under 42 U.S.C. §§ 406(b) & 1383(d)(2)*, Case No.: 6:12-mc-124-Orl-22 (M.D. Fla. Nov. 13,

---

[10] Because the Court reverses based on the last issue raised by Plaintiff, the Court does not fully analyze the first two issues raised on appeal.

2012).  This Order does not extend the time limits for filing a motion for attorney's fees under the Equal Access to Justice Act, 28 U.S.C. § 2412.

**DONE AND ORDERED** at Jacksonville, Florida, on March 26, 2018.

MONTE C. RICHARDSON
UNITED STATES MAGISTRATE JUDGE

Copies to:

Counsel of Record